IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL NO. 08-328-GPM |
| | ) |
| MIDWEST TRANSPORT, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

This is a civil action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. Plaintiff United States of America seeks to recover monies procured by Defendant Midwest Transport, Inc. ("Transport"), and a predecessor company Midwest Transit, Inc. ("Transit"), by allegedly overcharging the United States Postal Service ("Postal Service") for fuel expended in the performance of fixed-price Highway Contract Route ("HCR") contracts. The case currently is before the Court on cross-motions for partial summary judgment by Transport (Doc. 92) and the United States (Doc. 99), and on Transport's motion for summary judgment (Doc. 104).

### BACKGROUND

On July 25, 2001, Transit, an Illinois-based company owned by Hal Hicks and C. Michael Witters that operated HCR contracts with the Postal Service to carry mail between postal stations, was placed under the control of an interim receiver by an Illinois state court as a result of a legal dispute between Hicks and Witters. The receiver hired Kenneth Hohlbaugh to manage Transit during the receivership. In September 2003 Transport, which had been formed in 2002 as a new corporate entity by co-owners Hohlbaugh, John Elmore, Ed Smith, and Buddy Relihan, purchased

Transit's assets, including Transit's HCR contracts with the Postal Service. On December 4, 2003, officials from Transit, Transport, and the Postal Service executed a novation agreement whereby Transport assumed all of the HCR contracts operated by Transit. Thereafter, Transport operated both the novated contracts and HCR contracts awarded directly from the Postal Service; at the time this suit was filed Transport operated seventy-three HCR contracts.

The HCR contracts authorized the contractor, e.g., Transit, then Transport, to request increases in compensation from the Postal Service based upon increases in the cost of fuel of five cents or more per gallon over a twenty-eight day period; by the same token, the Postal Service could seek adjustment of the contract price based on decreases in the cost of fuel over the same period. Increases in compensation were obtained by submitting to the Postal Service fuel use certification forms showing increases in the contractor's cost per gallon for fuel to perform the contract. The fuel use certification forms were required to be certified as containing accurate and complete information and warned the contractor that willfully false statements or representations would subject the contractor to liability under 18 U.S.C. § 1001, which makes it a federal crime to submit false statements to the government.

The United States contends that between July 25, 2001, when Transit was placed under the control of the interim receiver, and August 2005, Transit and its successor Transport submitted to the Postal Service 337 fuel use certification forms that were fraudulent in that they failed to disclose discounts that the contractor was receiving from its retail fuel supplier, Pilot Corporation ("Pilot"). According to the United States, from May 2001 until December 2001, Pilot gave Transit a fuel discount of approximately three cents per gallon; thereafter Pilot gave Transit and its successor Transport a discount of four cents per gallon or more. The United States alleges that between

July 25, 2001, and September 2003, Transit and Transport received discounts from Pilot of more than $550,000 in the form of rebate checks, without disclosing any such discounts to the Postal Service on fuel use certification forms. The United States alleges also that between October 2003 and August 2005, Pilot gave Transport discounts in excess of $474,590.06 through what the government terms an "off-invoice" scheme. Under this scheme, Transport did not pay Pilot the amounts for fuel listed on point-of-sale receipts Transport submitted to the Postal Service in support of fuel use certification forms; instead, Transport paid a lesser amount that reflected its per-gallon discount from Pilot, with the final, discounted fuel prices being listed on weekly invoices from Pilot to Transport. On April 6, 2005, Hal Hicks was indicted in federal court for, inter alia, making false statements in a fuel use certification form submitted to the Postal Service, in violation of 18 U.S.C. § 1001; on January 12, 2006, Hicks pleaded guilty to that offense.

In 2007 the United States filed its complaint in this action in the United States District Court for the Northern District of Texas alleging: violations of the FCA, specifically, causing to be presented false or fraudulent claims to the United States and using or causing to be used a false record or statement to get a false or fraudulent claim to be paid by the United States (Count I and Count II of the complaint, respectively); unjust enrichment (Count III); and payment by mistake of fact (Count IV). In April 2008 the case was transferred to this Court. Although Transport for a time asserted counterclaims against the government for breach of the duty of good faith and fair dealing under the 2003 novation agreement, fraud in the inducement to enter the agreement, negligent misrepresentation, and for declaratory relief, the Court dismissed Transport's counterclaims by order entered November 24, 2008. At the present time both Transport and the government seek partial summary judgment on the issue of Transport's liability for alleged false claims by Transit,

and Transport also seeks summary judgment as to the government's allegations of false claims against it. The motions have been briefed extensively, and the Court has conducted a hearing on them.[1] Having considered carefully all of the arguments of the parties, the Court now rules as follows.

## ANALYSIS

Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim . . . . at any time after . . . 20 days have passed from commencement of the action[.]" Fed. R. Civ. P. 56(a)(1). The rule provides also that "[a] party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). Summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party. *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981). On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See*

---

1. At the hearing on the instant motions, the Court raised the question of whether, in light of the fact that both the Postal Service and Transport were entitled to seek adjustments of the contract price of fuel, the former had in fact suffered damage. Following the hearing, both sides submitted supplemental filings on this question (Docs. 124, 125). Also, following the hearing, the government sought leave to supplement the record with evidence tending, in its view, to impeach the credibility of certain witnesses for Transport, which leave was granted on July 28, 2009 (Docs. 127, 131).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994). In evaluating a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). "Importantly, the mere fact that all parties to an action have moved for summary judgment does not, in itself, show the absence of any genuine issue for trial. 'Counter-motions for summary judgment do not automatically empower the court to dispense with the determination of whether questions of material fact exist.'" *Boeckman v. A.G. Edwards, Inc.*, Civil No. 05-658-GPM, 2007 WL 4225740, at *1 (S.D. Ill. Aug. 31, 2007) (quoting *Krawczyk v. Harnischfeger Corp.*, 869 F. Supp. 613, 621 (E.D. Wis. 1994)). "Merely because both parties move for summary judgment does not mean that one party must prevail. If neither party demonstrates that summary judgment in its favor is warranted, neither motion will be granted." *Id*.

    **A.**    **Liability of Transport for False Claims by Transit**

Turning first to the cross-motions for partial summary judgment brought by Transport and the United States, the issue presented therein is the liability of Transport for forty-four allegedly false fuel use certification forms submitted to the Postal Service by Transit between July 25, 2001, and December 4, 2003. Transport argues that, as a corporate entity distinct from Transit, it cannot be held liable for Transit's alleged misconduct under either the terms of the 2003 novation agreement whereby Transport assumed Transit's HCR contracts with the Postal Service or federal common-law principles of successor liability. Also, Transport claims that it has been released from liability for the actions of Transit by a stipulation of settlement entered into by the United States in December 2008 in a civil FCA action brought in this Court against Hal Hicks, *United States v.*


*Hicks*, Civil No. 05-4189-GPM (S.D. Ill. filed Sept. 30, 2005). The United States disagrees, of course, and has counter-moved for partial summary judgment as to Transport's liability for false claims by Transit on grounds of both the novation agreement and successor liability.

The 2003 novation agreement contains three key provisions regarding Transport's liability for the acts of Transit. The first is one of eight facts "of which the parties agree and which form a basis for this agreement," namely that Transport "agrees to assume all obligations and liabilities of [Transit] under the [HCR] contracts, including all liabilities arising out of the performance of said contracts." Doc. 100-2 at 33, ¶ (b)(4). The second relevant provision is that Transport "also assumes all obligations and liabilities of and all claims against [Transit] under the contracts as if [Transport] were the original party to the contracts." *Id*. at 34, ¶ (c)(2). Finally, section (c)(3) of the novation agreement states that Transport "ratifies all previous actions taken by [Transit] with respect to the contracts, with the same force and effect as if the action had been taken by [Transport]." *Id*., ¶ (c)(3). Transport, relying heavily upon *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327 (4th Cir. 1989), in which the court held that a novated agreement did not shift the FCA liability of a transferor onto a transferee, argues that under the 2003 novation agreement it assumed Transit's contractual obligations but not its statutory liability for alleged FCA violations. The Court, for its part, assumes that the FCA is an implied term of the HCR contracts, consistent with the general rule that the law in effect when a contract is made is an implied term of the contract, *see, e.g., A.E.I. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 955-56 (7th Cir. 2002), so that a breach of the HCR contracts, if fraudulent, also constitutes an FCA violation, and vice versa. Moreover, it is ridiculous to claim, as Transport does, that FCA liability in this instance can be separated in any meaningful way from a contractual duty of performance,

given that it is only by virtue of the duty to perform the HCR contracts that either Transit or Transport had any occasion to submit fuel use certification forms to the Postal Service. Finally, the novation agreement states explicitly that Transport ratifies Transit's actions with respect to the HCR contracts, including presumably the submission of allegedly false claims regarding the cost of fuel to perform the contracts.

In addition to the novation agreement, there is also the question of Transport's liability for false claims by Transit under successor liability principles. The federal common law doctrine of successor liability allows a plaintiff to bring suit against a genuinely distinct purchaser of a business if: (1) the successor had notice of the claim before the acquisition; and (2) there was "substantial continuity in the operation of the business before and after the sale[.]" *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994). *See also Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1235-36 (7th Cir. 1986). Proof of substantial continuity in the operations of the predecessor corporation and the successor entity may, by itself, also satisfy the notice prong by suggesting that there was actual knowledge of a claim by the successor corporation or its principals. *See Chicago Truck Drivers, Helpers & Warehouse Workers, Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49-50 (7th Cir. 1995). In this instance Transport and Transit during the period it was under the control of the receiver are essentially the same company. Janie Ensminger was the contracting officer in charge of Postal Service contracting for Transit, in which capacity, the United States alleges, she prepared false fuel use certification forms under the direction of Hicks; she continued to handle Postal Service contracting for Transit during the receivership and later handled such contracting for Transport. Kenneth Hohlbaugh acted as general manager of Transit during the receivership, overseeing the company's total operations; later, he performed the same duties as president of

Transport. Ed Smith was chief financial officer ("CFO") for Transit, then CFO and vice president for Transport. John Elmore was general counsel for both Transit and Transport, as well as vice president for Transport. Buddy Relihan was operations manager for both Transit and Transport. All 700 Transit employees became employees of Transport, and Transport began operations with trucking equipment used by Transit. Moreover, Transport held itself out to the public in general and the Postal Service in particular as the corporate successor in interest to Transit. Under these circumstances, there is obviously a genuine issue for trial as to whether Transport can be held liable for FCA violations by Transit under successor liability principles. Transport does not seriously dispute the existence of substantial continuity between its operations and those of Transit, but argues that successor liability generally is employed in a limited way in federal common law and as a matter of policy should not be employed in the FCA context. The Court for its part cannot see any reason why it should not be so employed: otherwise, persons who have defrauded the United States could escape liability therefor through the simple expedient of incorporating new entities by which to carry out fraudulent schemes against the government.

With respect to the release executed in *United States v. Hicks*, a suit based on Hicks's failure while president of Transit to disclose fuel discounts to the Postal Service during the period from October 31, 2000, to July 25, 2001, that release provides, in pertinent part, that the United States releases "all claims and causes of action against Hicks and any companies he had an interest in through the date of the settlement, July 21, 2008, which were brought or could have been brought in the above-captioned matter." Doc. 93-2 at 95 ¶ 3. Transport contends that because Hicks held fifty percent of Transit's shares, the release operated to discharge all of Transit's liability and, derivatively, all liability of Transport for false claims by Transit. The United States points out that

Hicks never held any kind of interest in Transport and that no claim against Transport could have been brought in the *Hicks* case. Also, the United States disputes whether Hicks held an "interest" in Transit within the meaning of the release during the period that Transit was in interim receivership, given that Hicks was enjoined by the Illinois state court from participating in any way in Transit's operations. Finally, the United States contends that, in order for Transport to claim the benefit of the release, it must first have been an intended third-party beneficiary of the release, but was not. The government's position regarding third-party beneficiary status seems persuasive to the Court. It appears likely that the purpose of the release was to ensure that Hicks would not be held liable for actions of corporations in which he was a shareholder and/or director. It seems unlikely that the release was intended to benefit a company like Transport that under the novation agreement already had assumed Transit's liabilities a number of years before the release was executed.[2] On the state of the record it appears that there is a genuine issue for trial as to whether Transport is shielded from liability for the actions of Transit through the release executed in 2008 by the United States and Hicks in the government's civil FCA action against Hicks. Thus, while it appears to the Court that Transport can be held liable for false claims by Transit on the strength of the 2003 novation agreement, where the issue of whether Transport was released from liability via the 2008 stipulation of settlement entered into by Hicks and the United States is not susceptible of resolution on summary judgment, the Court must deny in their entirety the cross-motions for partial summary judgment before it.

---

2. The fact that this suit was filed over a year before the release was executed, with counsel for the United States in *Hicks* acting as counsel in this case as well, also suggests strongly that the release was not intended to shield Transport from liability for alleged false claims by Transit.

### B.     Liability of Transport for its Own False Claims

Turning finally to Transport's motion for summary judgment, in the motion Transport presents an impressively thorough exposition of the defense it intends to mount at trial.  Unfortunately, Transport's arguments for summary judgment go largely to the issue of whether the fuel use certification forms submitted to the Postal Service both by Transit and Transport were knowingly false so as to trigger liability under the FCA.  A contractor is liable under the FCA only if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the United States.  31 U.S.C. § 3729(a)(1)(A)-(B).  The United States carries the burden of proof to show:  (1) the contractor presented a claim to the government; (2) the claim was false or fraudulent; and (3) the contractor submitted the claim knowing it was false or fraudulent.  *See Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1044 (N.D. Ill. 1998).  The term "knowingly" for FCA purposes means:  (1) actual knowledge that the claim is false; (2) deliberate ignorance of the truth or falsity of the claim; or (3) reckless disregard of the truth or falsity of the information.  *See* 31 U.S.C. § 3729(b)(1); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998).  "The requisite intent is the knowing presentation of what is known to be false . . . .  In short, the claim must be a lie." *Hindo v. University of Health Scis./The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995).  Thus, innocent mistakes, faulty calculations, flawed reasoning, imprecise statements, and differences in interpretation growing out of a disputed legal question are not false claims.  *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).  The questions raised by Transport in its summary judgment motion regarding whether Transport and its predecessor Transit

acted reasonably in light of their understanding of their contracts with the Postal Service, their knowledge of relevant Postal Service policies, the customs of their industry, and so forth squarely present issues of knowledge and intent that obviously are for the trier of fact to resolve.

Transport attempts to frame as a simple matter of contract interpretation the question of whether the cost of fuel that Transport was required to certify to the Postal Service in fuel use certification forms meant simply the retail price of fuel, not the actual price Transport paid for fuel, including discounts and rebates from Pilot.  However, the profusion of extrinsic evidence offered by Transport in support of its interpretation of the supposedly unambiguous HCR contracts belies Transport's claim that it is entitled to summary judgment on the basis of the plain language of the contracts.  In fact, the gist of Transport's argument is that until 2005 it operated on the reasonable assumption that it was not required to report post-sale discounts and rebates for fuel to the Postal Service.  For example, Transport points out that its HCR contracts with the Postal Service were fixed-price contracts, under the terms of which once an agreement upon price was reached by the contracting parties, the contractor was entitled to retain every dollar by which the contract price exceeded the actual costs of performing the work specified under the contract.  Transport notes that price adjustment mechanisms on fixed-priced contracts are commonly based on fluctuations in market prices or industry price indexes rather than on a contractor's actual cost.  Also, Transport points out that the HCR contracts at issue contained no provisions requiring the contractor to remit to the Postal Service amounts that it was able to save through rebate agreements with retail fuel sellers. Transport notes that specific provisions concerning rebates can be found in certain standard contracts used by the Postal Service and that had the Postal Service wished to do so it could have included such clauses in its HCR contracts with Transport.  In light of these facts, Transport argues

that under the relevant HCR contracts it was required to report to the Postal Service only the retail cost of fuel, together with point-of-sale discounts, but not the actual price Transport paid for fuel, allowing for post-sale discounts Transport received for prompt payment to its retail fuel supplier.

According to Transport, since at least 1979 the Postal Service has known that its HCR contractors have been receiving discounts or rebates for fuel and that notwithstanding this knowledge, the Postal Service issued no instructions, regulations, policy statements, or contract provisions expressly prohibiting contractors from obtaining such discounts and rebates or expressly requiring contractors to turn them over to the Postal Service. In support of its position, Transport offers the affidavit of former Postal Service official Paul Seehaver, who served as General Manager of Contract Transportation for the Postal Service and who was responsible in great part for designing the Fuel Purchase Plan ("FPP") which governed fuel contracting between Transport and the Postal Service during the period relevant to this case. According to Mr. Seehaver, while the FPP contemplated that contractors would disclose to the Postal Service point-of-sale discounts on fuel, the FPP was not intended to establish a requirement that contractors disclose prompt payment discounts from retailers. Transport also relies upon the testimony of Theresa San Luis, who as a Postal Service official worked in the area of fuel contracting until her retirement in 2004. In her affidavit Ms. San Luis states that, during the years that she processed contract price adjustments for fuel in the Postal Service's field office in Washington, D.C., she frequently encountered instances in which HCR contractors earned a prompt payment discount or rebate for their fuel purchases. It was the policy of her office that prompt payment discounts or rebates were not included in calculation of average fuel prices for HCR contracts. When Ms. San Luis later served at the Postal

Service's headquarters, she attests, it was the policy of that office to recognize that HCR contractors were entitled to retain the full amount of any prompt payment discount or rebate they received from their fuel supplier and that the Postal Service had no right or entitlement to the contractor's receipt of prompt payment discounts or rebates for fuel. Additionally, Transport adduces evidence that, consistent with Transport's understanding of Postal Service policies, Janie Ensminger, who served as noted as the contracting officer first for Transit, then Transport, interpreted fuel use certification forms as requiring disclosure only of point-of-sale discounts, not prompt payment rebates received on company-wide purchases of fuel, and prepared bid prices based on retail fuel prices without regard for potential transactional discounts that the contractor might receive. Transport points out that in July 2002 Ensminger advised the Postal Service that she did not believe that HCR contractors were required to identify or to turn over to the Postal Service prompt payment rebates received from a fuel supplier, and that the Postal Service did not make its contrary position known until October 2005, over three years later.

It is unnecessary, of course, for the Court to recapitulate all of the abundant evidence Transport puts forward in support of its motion for summary judgment; suffice it to say that it appears that Transport will be able to mount a very substantial defense at trial and that there is much grist for the jury here. While Transport's summary judgment motion offers, as the Court has said, an impressively thorough preview of Transport's trial defense, the issues raised by the motion concerning whether Transport and its predecessor Transit acted reasonably in light of industry customs and Postal Service policies or whether they submitted to the Postal Service fuel use certification forms that were knowingly false within the meaning of the FCA plainly are not susceptible of resolution on summary judgment.

## CONCLUSION

The cross-motions for partial summary judgment of Transport (Doc. 92) and the United States (Doc. 99) and Transport's motion for summary judgment (Doc. 104) are **DENIED**.

**IT IS SO ORDERED.**

DATED:  July 29, 2009

                                                S/G. Patrick Murphy
                                                G. PATRICK MURPHY
                                                United States District Judge